## UNITED STATES v. WEISMAN.
### No. 278.

Circuit Court of Appeals, Second Circuit.

April 22, 1940

Before L. HAND, CHASE, and CLARK, Circuit Judges.

George Wolf, of New York City, for appellant.

John T. Cahill, U. S. Atty., of New York City (Walter R. Mansfield and Jerome Doyle, Asst. U. S. Attys., both of New York City, of Counsel) for appellee.

L. HAND, Circuit Judge.

The defendant appeals from a sentence of six months following a conviction by the district judge for refusing to answer two questions, put to him by a grand jury on January 26, 1940. The questions were: first, whether he had ever received any cables at Murray's Restaurant, Sixth Avenue, New York; second, whether he knew anyone who visited, lived in, or stayed at, Shanghai in the years 1934 to 1939. The defendant had already been before the grand jury a number of times in December, 1939, and January, 1940, and had answered a few questions, but in the main had claimed his privilege against crimination. On January 22, he had denied that he had received any cables at Murray's Restaurant in 1934, but had immediately asked to retract the answer, and had thereupon asserted his privilege. Similarly on the 24th he had at first denied that he knew anyone who had visited Shanghai in 1934, but had immediately asked to retract; as to 1939 he also denied knowing anyone, but that denial he let stand. These answers the prosecution urges as an abandonment of the privilege; but we agree with the defendant that they were slips, and not really intended as an abandonment. The defendant's attorney, who was of course not with him before the grand jury, had instructed him to claim his privilege, and nothing had happened to change that purpose which he had claimed again and again. We shall, therefore, dispose of the appeal on the assumption that the privilege, whatever it was, remained.

The two questions were on their face innocent, and it lay upon the defendant to show that answers to them might criminate him. United States v. Burr (In re Willie), Fed.Cas. No. 14,-692e; State v. Thaden, 43 Minn. 253, 255,

45 N.W. 447; Regina v. Boyes, 1 B. & S. 311, 321; United States v. Zwillman, 2 Cir. 108 F.2d 802. Whether he had the burden of proof upon that issue we need not decide, for we think in any case he proved his excuse. Obviously a witness may not be compelled to do more than show that the answer is likely to be dangerous to him, else he will be forced to disclose those very facts which the privilege protects. Logically, indeed, he is boxed in a paradox, for he must prove the criminatory character of what it is his privilege to suppress just because it is criminatory. The only practicable solution is to be content with the door's being set a little ajar, and while at times this no doubt partially destroys the privilege, and at times it permits the suppression of competent evidence, nothing better is available. All this has been long understood, but it is not so clear to what facts the privilege extends. Does it protect more than those which "tend" to prove a crime? Does it also cover those which can only be clues to the discovery of other facts which in turn so "tend"? The doctrine of Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, goes as far as the second; though we need not say how far it has been affected by later decisions. Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198. All crimes are composed of definite elements, and nobody supposes that the privilege is confined to answers which directly admit one of these; it covers also such as logically, though mediately, lead to any of them; such as are rungs of the rational ladder by which they may be reached. A witness would, for example, be privileged from answering whether he left his home with a burglar's jimmy in his pocket, though that is no part of the crime of burglary. This, as we shall try to show, is as far as we need go here.

■ The defendant offered in evidence an indictment found in the year 1937 by the grand jury of the Southern District of New York against thirty persons (not including himself), charging a conspiracy to import narcotic drugs from Shanghai, payment to be made either by messenger, or by cable, direct to China; cables also being sent from New York to advise the shippers that the drugs had arrived, upon which "arrangements would * * * be made, likewise in code, by cable for the transmission of the next shipment".

This indictment the judge ruled out, but it was clearly competent, and we shall dispose of the appeal as though he had admitted it. The defendant's examination was part of an investigation afoot about the importation of narcotics, in the course of which the prosecution had secured possession of three cables from Shanghai, to which the question almost certainly referred. These were addressed to one, "L. C. Spiegel, 1247 Sixth Avenue" (Murray's Restaurant) and were in code; they were all dated in March, 1937, and were apparently among those mentioned in the indictment. An article had appeared in a New York newspaper, declaring that the federal district attorney would soon indict, as a dealer in narcotics, "the owner of a big advertising agency", who had been the "one-time partner of a big gangster", and who had been "in hiding for a month". The defendant was in fact the head of an advertising agency, and it had been rumored that at one time he had been the accomplice of a "gangster". He had in fact gone to Florida under circumstances which suggest that he was trying to hide; and the prosecution had questioned his family about his business between 1934 and 1939, and had secured the books of his business.

With this background it is easy to see that the danger from an answer to the first question was real. If the defendant had in fact received the three cables at Murray's Restaurant, there was reason to suppose either that, in spite of his denial, he was the Spiegel to whom they were addressed, or that he was acting on Spiegel's behalf. The indictment was in turn evidence that some such cables had been used in executing the conspiracy, and there was an antecedent probability that the prosecution's cables were among these. Further, the defendant was plainly justified in supposing that he was the object of pursuit by the district attorney; and, while the irresponsible gossip of a newspaper is a weak reed, there is always the possibility that it may for once be right. It directly pointed to the defendant, and it would certainly have disturbed any but the most hardy.

■ The case for the privilege against answering the second question was not so strong; yet strong enough in our judgment. The defendant might

of course have known people living in Shanghai, or visiting there, without being implicated in the conspiracy of which Shanghai was the focus. But we are to take the question in its setting, including the other question and the information of which we may reasonably infer the prosecution had possession. United States v. Zwillman, supra, 108 F.2d 802. The persons in Shanghai with whom the owner of a New York Advertising business would be likely to be acquainted, were not many, and among them would be the senders, or sender, of any cables received at Murray's Restaurant. Those were in code, and, as we have already said, were presumptively among the cables by which the conspiracy had been carried out. Again we are to remember that the defendant had been the object of much more than casual interest by the prosecution. These things made it perilous for him to answer; if he had acknowledged such acquaintances, it would probably have directly connected him with the principals in the conspiracy.

Mason v. United States, supra, 244 U. S. 362, 37 S.Ct. 621, 61 L.Ed. 1198, certainly does make against our conclusion, at least as to the second question. The Alaska statute there in question made it a crime to take part in a game of cards played for money; and the questions were merely whether the defendants had seen a game of cards being played, from which of course it did not follow that it was being played for money, or that they had taken a hand in it, if it had been. Yet it is also true that an affirmative answer would have been an admission of one of the three elements of which their guilt would be composed: (1) a game of cards; (2) a money stake; (3) the witness a hand in the game. Nevertheless, we think that the decision did not necessarily go further than to hold that not even answers which directly "tend" to prove the crime are inevitably protected; that there must be some reason to fear that the disclosure will put the witness in pressing danger. Indeed, perhaps in the end we should say no more than that the chase must not get too hot; or the scent, too fresh. In any event we are satisfied that if the privilege is to be of any value, a situation like that at bar must fall within it.

Judgment reversed; defendant discharged.