AMERICAN CYANAMID COMPANY

v.

Nathan SHARFF

Sidney Martin Fox, Appellant.

No. 14036.

United States Court of Appeals Third Circuit.

Argued June 22, 1962.

Decided Nov. 8, 1962.

Robert C. Gruhin, Belleville, N. J. (Armand J. Rosenberg, New York City, on the brief), for appellant.

Walter R. Mansfield, New York City (Pitney, Hardin & Kipp, Newark, N. J., Donovan, Leisure, Newton & Irvine, New York City, Frank C. O'Brien, Newark, N. J., Helmut J. F. Furth, John A. Stichter, New York City, on the brief), for appellee.

Before BIGGS, Chief Judge, and GANEY and SMITH, Circuit Judges.

BIGGS, Chief Judge.

This is an appeal from an order of the United States District Court for the District of New Jersey, adjudging the appellant Fox in contempt of court. The contempt charged is a civil one.

Fox had been required to appear as a witness for the taking of his pre-trial deposition in the action between American Cyanamid Company, the plaintiff, and Nathan Sharff, the defendant.

Fox moved to set aside the notice of examination, and to stay the examination itself. These motions were denied. Cyanamid then moved to compel Fox to answer the questions propounded in the examination before trial. The motion was granted and Fox was directed to reply to the questions set out in the footnote.[1] Fox declined to answer these

1. As follows:
"Q. How long were you employed by American Cyanamid Company?"
"A. I decline to answer that question on the grounds that the answer thereto may tend to incriminate me."
"Q. How long were you employed by Metal Salts?"
"A. I decline to answer that question on the grounds that the answer thereto may tend to incriminate me at this time."
"Q. How long have you known Nathan Sharff?"
* * *
"Q. How long have you known Seymour Salb?"
* * *
"Q. How long have you known John Cancelarich?"
* * *
"Q. How long have you known him [Sigmund or Siegfried Muller]?"
* * *
"Q. How long have you known Stephen M. Stolar?"
* * *
"Q. How long have you been engaged in the practice of chemistry?"
* * *
"Q. How many trips have you made out of the United States since January 1, 1958?"
* * *
"Q. By what Italian company were you employed?"
* * *
"Q. How long have you been acquainted with Victor Origoni?"
* * *
"Q. Do you know a company called Biorganics, Inc.?"
* * *

"Q. Have you ever been employed by, or rendered any services to Biorganics, Inc.?"
* * *
Mr. Mansfield: "Do you know a person named Mitchell Blicharz?"
* * *
"Q. What were your duties when you were employed by American Cyanamid Company?"
* * *
"Q. What were your duties when you were employed by Metal Salts?"
* * *
"Q. What have been your duties with Kim Laboratories, Inc?"
* * *
"Q. Are you acquainted with a person named Leonard Fine?"
* * *
"Q. You mentioned the activities of Kim Laboratories, or the business of Kim Laboratories earlier; has it ever done any business in antibiotics?"
* * *
"Q. Have you ever had any communications with anyone in Biorganics, Inc.?"
* * *
"Q. Have you ever had any communications with Nathan Sharff?"
* * *
"Q. Have you ever had any communication with Seymour Salb?"
* * *
"Q. Have you ever been employed by Biorganics, Inc.?"
* * *
"Q. Have you ever rendered any services to it?"
* * *
"Q. Have you ever been employed by Nathan Sharff?"
* * *

questions, basing his refusal on the privilege against self-incrimination.

"Q. Have you ever rendered any services to Nathan Sharff?"

\* \* \*

"Q. Have you ever visited the offices of Biorganics, Inc.?"

\* \* \*

"Q. Have you ever visited the home of Nathan Sharff?"

\* \* \*

"Q. Have you ever had any communication with John Cancelarich?"

\* \* \*

"Q. Have you ever been employed by him, referring to Cancelarich?"

\* \* \*

"Q. Have you ever employed him?"

\* \* \*

"Q. Are you acquainted with a person known as Elio Salvetti, E-l-i-o S-a-l-v-e-t-t-i?"

\* \* \*

"Q. Are you acquainted with a party named Rosenblatt?"

\* \* \*

"Q. Are you acquainted with a person named Lanzerini, L-a-n-z-e-r-i-n-i?"

\* \* \*

"Q. Have you ever had any communication, written or oral, with any Italian drug companies?"

\* \* \*

"Q. Are you acquainted with an Italian drug company named Leo Industrie Chiniche Farmaceutiche?"

\* \* \*

"Q. Are you acquainted with a company affiliated with Leo Icar, I-c-a-r?"

\* \* \*

"Q. Are you acquainted with a Dr. Giovanni Auletta?"

\* \* \*

"Q. Are you going to answer that one?"

\* \* \*

"Q. Are you acquainted with a Dr. Avanzini?"

\* \* \*

"Q. Are you acquainted with a Professor Paolini?"

\* \* \*

"Q. Did you ever stay at a hotel in Rome?"

\* \* \*

"Q. Did you ever stay at a hotel there named Hotel Mediterraneaneo?"

\* \* \*

"Q. Are you acquainted with any of the officers of Ankerman Italiano?"

\* \* \*

"Q. Are you acquainted with a Dr. Roland of Ankerman Italiano?"

After an examination, in which the court below investigated the incrimina-

\* \* \*

"Q. Do you know a person named Manfried, M-a-n-f-r-i-e-d Beckermeier, B-e-c-k-e-r-m-e-i-e-r?"

\* \* \*

"Q. Do you know a company known as Pierrel Spa?"

\* \* \*

"Q. Do you know a company known as LePetit?"

\* \* \*

"Q. Do you know a person known as Nicolo, N-i-c-o-l-o Visconti?"

\* \* \*

"Q. Do you know a company called Alfa Antibiotici?"

\* \* \*

"Q. Do you know a company named Carlo Erba?"

\* \* \*

"Q. Do you know a person named Dr. Robert Esse?"

\* \* \*

"Q. Do you know a company named Panmed, P-a-n-m-e-d Pharmaceuticals, Inc.?"

\* \* \*

"Q. Do you know a person named Caesar, C-a-e-s-a-r Bottone, B-o-t-t-o-n-e?"

\* \* \*

"Q. Do you know a person named Dr. Leon Feldman?"

\* \* \*

"Q. Do you know a person named Kurt, K-u-r-t, Spira?"

\* \* \*

"Q. Do you know a company named Intermediates, Inc.?"

\* \* \*

"Q. How long have you lived at your present address?"

\* \* \*

"Q. After you finished your education what has been your professional activity in general? What have you been doing since you got out of college?"

\* \* \*

"Q. Do you know a person named Joseph Martin?"

\* \* \*

"Q. Do you have any other name besides the name you have given, Sidney Martin Fox?"

\* \* \*

"Q. Do you know a company in New York called George Uhe Co., Inc.?"

\* \* \*

"Q. Have you ever published any professional papers over your own name?"

\* \* \*

tory tendencies of the questions, Fox was ordered to answer. He refused to obey this direction, and the court ordered him committed until he answered. This appeal followed.

■ That the privilege against self-incrimination extends to all judicial or official proceedings where persons are compelled to give testimony permits small argument. United States v. Goodner, 35 F.Supp. 286 (D.Colo.1940). This court in United States v. Coffey, 3 Cir., 198 F.2d 438, 440 (1952), stated that it is enough to justify the exercise of the privilege: "(1) that the trial court be shown by argument how conceivably a prosecutor * * * might proceed step by step to link the witness with some crimes against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in .the circumstances of the particular case." Once it has been determined that a conceivable possibility exists of the commission of a crime against the United States the trial court must then decide whether the questions asked have a tendency to incriminate.

In describing the kinds of questions which give rise to a valid exercise of the privilege against self-incrimination, Judge Learned Hand said: "All crimes are composed of definite elements, and nobody supposes that the privilege is confined to answers which directly admit one of these; it covers also such as logically, though mediately, lead to any of them; such as are rungs of the rational ladder by which they may be reached. A witness would, for example, be privileged from answering whether he left his home with a burglar's jimmy in his pocket, though that is no part of the crime of burglary." United States v. Weisman, 111 F.2d 260, 262 (2 Cir.1940).

■ The function of determining whether a direct answer to a question will furnish evidence against the witness falls on the court. United States v. Burr (In re Willie), 25 Fed.Cas. 38 (1807). If the questions appear innocent upon their face the witness must then "show that answers to them might criminate him". United States v. Weisman, 111 F.2d 260, 261 (2 Cir.1940). To require a showing on the part of the witness of more than the likelihood of danger to him arising from answering the question would defeat the privilege granted.

■ In reviewing an order of contempt arising from a plea of self-incrimination the decision of the trial judge must be given weight. Mason v. United States, 244 U.S. 362, 366, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). But in order to deny the application of the privilege, it must be " 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answers cannot possibly have such a tendency' " to incriminate. Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), citing Temple v. Commonwealth, 75 Va. 892, 898 (1881); cited with approval in Counselman v. Hitchcock, 142 U.S. 547, 579–580, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

■ Using the standards set out above, the first inquiry must be whether there appears to be a conceivable possibility that the witness could be linked to a crime against the United States.

From reading (a) the complaint of the plaintiff Cyanamid filed in the action against the defendant Sharff,[2] and (b)

2. Extracts from the complaint between American Cyanamid Company and Nathan Sharff are as follows: Paragraph 5—"Cyanamid (through its Lederle Laboratories Division) is and for many years has been engaged in the research and development of new and improved drugs and other pharmaceutical products, including antibiotics and steroids, and in the manufacture and sale thereof * * *."

Paragraph 9—"In the period during which said individuals [Fox, Cancelarich and Muller] were engaged as employees of Cyanamid, it expended in excess of $100,000,000 in research and in the development of data, information, and techniques relating to the development, improvement and manufacture of new and

the complaint filed by Cyanamid in an action against Fox in the Supreme Court of New York [3] and (c) the affidavit, executed by the plaintiff's, Cyanamid's, counsel, which was served upon Fox at the time he received notice to appear for the taking of his deposition in this proceeding,[4] we find that Fox has been charged

improved pharmaceutical products, including antibiotic drugs and steroids."

Paragraph 12—"* * * [D]efendant Sharff and Biorganic Laboratories, Inc. have conspired to procure from Cyanamid employees * * * confidential information, * * * including valuable strains of micro-organisms developed and owned by Cyanamid and used by it in the manufacture of pharmaceutical antibiotics. In pursuance of this conspiracy defendant Sharff has offered to pay or arranged for payments * * * to the said Fox, and others employed or formerly employed by Cyanamid, in return for the disclosure and procurement and delivery by such individuals to defendant Sharff, Biorganic Laboratories, Inc. and others of such confidential information and property."

Paragraph 14—"* * * [D]efendant, co-conspirators and others not named as defendants herein, have sold, offered for sale, disclosed and otherwise disseminated, transferred and made available such confidential information and property to various foreign firms, including Italian firms * * *."

Paragraph 18—"Defendant, acting pursuant to and in furtherance of the conspiracy hereinabove alleged, wrongfully, knowingly and intentionally procured, utilized, disclosed, offered for sale or sold or to be disseminated transferred or made available to third parties, * * * information and other property (including, but not limited to, samples of drugs and micro-organisms) known to belong to plaintiff without plaintiff's consent, knowledge or agreement."

Paragraph 22—"Defendant, acting pursuant to and in furtherance of the conspiracy hereinabove alleged has wrongfully * * * procured * * * offered for sale, sold and otherwise * * * made available, * * * trade secret information, samples of micro-organisms and such other property belonging to plaintiff * * *."

3. Extracts from complaint between American Cyanamid Co. and Sidney Martin Fox:

Paragraph 10—"Defendants Kim and Fox conspired with Nathan Sharff * * * with Biorganic Laboratories Inc., * * * and with others, to breach Fox's employment contract [with Cyanamid] by his furnishing, in violation thereof, confidential information * * * including

valuable strains of micro-organisms."

Paragraph 11—"* * * as a direct result of such conspiracy, said Fox, Cancelarich, Muller and others employed or formerly employed by Cyanamid * * * were induced to furnish such confidential information and such property to Sharff, Biorganic Laboratories, Inc., Kim and others * * *."

Paragraph 12—"* * * Defendants, co-conspirators and others not named as defendants herein have sold * * * transferred and made available such confidential information and property to various foreign firms, including Italian firms * * *."

Paragraph 16—"Defendants pursuant to and in furtherance of the conspiracy * * * knowingly and intentionally procured * * * offered for sale, sold, or caused to be offered for sale or sold * * * trade secret information and other property (including, but not limited to, samples of drugs and micro-organisms) known to belong to plaintiff, without plaintiff's consent."

4. Extracts of the affidavit follow:

Paragraph 5—"Evidence relevant to plaintiff's claim is in the knowledge and possession of * * * Sidney Martin Fox * * * who is named in the complaint as one of several co-conspirators * * *."

Paragraph 6—"* * * Sidney Martin Fox * * * [has] knowledge of other persons who have been and are participating in the conspiracy alleged in the complaint the purpose and results of which have been and are continuing to be the wrongful procurement, utilization, dissemination and sale to third parties of trade secrets and other confidential information and property owned by the plaintiff * * *."

Paragraph 8(a)—"Much of the trade secrets, confidential information and valuable strains of micro-organisms developed by and belonging to plaintiff, which have been wrongfully acquired by defendant Sharff and the said Fox and other conspirators named in the complaint, have been disposed of and sold by them abroad to various foreign drug manufacturers including certain concerns in Italy."

Paragraph 8(b)—"* * * [D]uring the course of the conspiracy alleged in the complaint, said Fox has made numerous trips abroad, and particularly to

with being a co-conspirator in the receiving, selling, and transporting of trade secrets, strains of microorganisms, and sample drugs belonging to Cyanamid in interstate and foreign commerce, knowing them to have been stolen. The facts supporting this allegation, if proved, could give rise to an indictment under 18 U.S.C. §§ 2314, 2315 [5] if the term "goods, wares, and merchandise" employed in the statutes includes one of the articles, trade secrets, strains of microorganisms, or sample drugs alleged to have been transported, concealed, sold or disposed of by Fox, and if the article or articles had a value of $5,000 or more.

■ We point out that the law does not require that the recalcitrant witness be found to have clearly committed a crime against the United States before he is entitled to exercise the privilege. All that is necessary is that it be shown that conceivably he has committed such a crime.

■ Applying these rules, we now turn to the question of whether or not there is a conceivable possibility that the articles allegedly stolen are covered by the phrase "goods, wares, and merchandise". This court has previously stated that "the terms 'goods, wares, and merchandise' is a general and comprehensive designation of such personal property or chattels as are ordinarily a subject of commerce." United States v. Seagraves, 3 Cir., 265 F.2d 876, 880 (1959). Since the articles allegedly stolen are personal property, all that must be alleged and proven at trial is the fact that one or all of such articles are ordinarily a subject of commerce and therefore covered by the statute. We, however, can find nothing in the language of the trial judge (and he wrote no opinion) that would indicate with clarity that he applied the principle of law to which we have just referred. Moreover, the trial judge made no finding of fact respecting the conceivable possibility that the allegedly stolen items were of the value of $5,000 or more. The court below simply ordered Fox to answer and committed him to jail when he refused to testify. No question of double jeopardy is, of course, presented, since the alleged contempt is civil rather than criminal. As we have indicated the charges made against Fox may or may not constitute a crime against the United States. We cannot say as a matter of law, on the present record, that the items allegedly stolen by Fox are not ordinarily the subject of commerce. Nor can we say that these items are or are not worth $5,000 or more. The court below was not required to find that a crime clearly had been committed. It was required to find that there was or was not a conceivable possibility that a crime had been committed. The court, however, made no finding in respect to this vital issue.

Italy, to confer with, work for, and to sell to various foreign manufacturers the confidential information and property belonging to plaintiff which was wrongfully obtained from plaintiff pursuant to the conspiracy alleged."

Paragraph 8(c)—"In January 1961 two of those named in the complaint as co-conspirators, namely John Cancelarich and Siegfried Muller, suddenly resigned from plaintiff's employment and quickly thereafter departed for Europe whence they have not returned. He and Muller have, since their flight, frequently conferred with Fox in Italy, and I am informed that Cancelarich is presently employed in Italy by an Italian drug manufacturer."

5. 18 U.S.C. § 2314 provides that: "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,-000 or more, knowing the same to have been stolen, converted or taken by fraud * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

18 U.S.C. § 2315 states: "Whoever receives, conceals, stores, barters, sells or disposes of any goods, wares, or merchandise * * * of the value of $5,000 or more * * * moving as, or which are part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

We now turn to the issue of whether the facts sought to be elicited from Fox by the questions form a link in the chain of evidence necessary to convict Fox of the crimes proscribed by the statutes set out in note 5, supra. The questions the appellant refused to answer can be segregated into four groups: (1) those concerning Fox's professional and employment relations; (2) those relating to his personal contacts; (3) those concerning his contacts with companies, and (4) those dealing with his travel. In determining whether answers to these questions could form a necessary link in the chain of evidence leading to conviction of the crimes alleged, all pertinent circumstances must be looked to. In the complaints, referred to above, Fox was charged with being a co-conspirator who, with others, not all of whom were named, stole, transported and sold, in interstate and foreign commerce, property belonging to the plaintiff, to certain Italian firms, none of whom were named.

Fox was examined by the trial judge in order to determine whence his apprehension of incrimination arose. He stated that he had refused to answer the questions concerning his professional and employment contacts because "there is the possibility that by spelling out the length of employment it would * * * show that I had access to certain information * * * alleged by the complaint."

In refusing to answer the group of questions concerning his personal connections Fox said, "I may be incriminating myself by association." This answer was given when the questions involved persons named or not named in the complaint. Even though a name was not set out in one of the complaints Fox said "[I]t could be one of the others * * * I have been alleged to have conspired with". In response to a question as to his basis for refusing to answer the questions concerning his relations with companies he gave a two-fold answer. Some of the questions concerned companies which he said "may be considered one of the others in the suit". Other questions involved various firms which, he stated,

"may be * * * the Italian companies mentioned in the complaint".

Fox declined to answer the questions concerning his alleged travel activities upon the ground that "an answer to [these] questions may * * * show that I was present or not present [in Italy and other countries] at certain occasions", and "may establish a location for a conspiracy, * * * or a possible association with the conspiracy".

The thread that weaves its way through Fox's given reasons for his apprehension of incrimination is his alleged belief that, by responding to the questions asked, he would show circumstantially an opportunity for him to have participated in the alleged conspiracy.

Are questions which circumstantially show the opportunity to conspire the type of questions which form a link in the chain of evidence leading to a conviction for conspiracy?

■ "A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means."; Pettibone v. United States, 148 U.S. 197, 203, 13 S.Ct. 542, 37 L.Ed. 419 (1893). "It is well settled that a formal agreement of the parties concerned is not essential to the formation of a conspiracy. It is sufficient if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." Fowler v. United States, 273 F. 15, 19 (9 Cir. 1921).

■ Inasmuch as a major element to be proven is the fact that the parties to the conspiracy worked together understandingly, a showing that an opportunity existed for the planning or carrying out of the design alleged would be a logical and "mediate" step in such proof. Therefore, if the court below could have found from the information before it that answers to the questions posed would tend to show an opportunity to have participated in the alleged conspiracy, its con-

tempt order should not have been entered. But again we have no definite findings of fact or conclusions of law by the trial judge.

We have no way of being reasonably certain that the persons, places and items in the questions propounded were or were not within the purview of the vague wording of the complaints. Perhaps Fox could not have shown with greater specificity that the subject of each question was within the purview of the complaints without giving information which would endanger his privilege against self-incrimination but of this we cannot be certain on the present record. We point out that a witness is not barred in a situation like that at bar from introducing evidence through other witnesses that would show the incriminatory nature of the questions as to him. The burden of making such a showing rests however in the first instance, on the witness claiming the privilege. See Hooley v. United States, 209 F.2d 234, 236 (1 Cir. 1954). Although a witness can introduce evidence to show the incriminatory nature of the questions asked, we think that, under the circumstances at bar, the court on its own initiative might well have required Cyanamid to have given evidence relating to the inclusion or exclusion of the subject of each question in the vague terminology of the complaint, if Fox could not have done so without waiving his privilege. See Hoffman v. United States, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). See also Redlich, The Rights of Witnesses Before Congressional Committees, 36 N.Y.U. Law Rev. 1126 (1961). Under the circumstances of this case the view we have expressed does not seem unreasonable. The trial court should not deem itself to be "a mere keeper of the ring" in the tradition of the English civil law.

■ In our opinion the case at bar is one which preeminently requires findings of fact and conclusions of law in respect to the issues indicated above despite the fact that Rule 52(a), Fed.R.Civ.Proc., 28 U.S.C., is not expressly applicable.[6] Cf. Jewel Tea Co. v. Kraus, 204 F.2d 549, 550 (7 Cir., 1953). As we have stated, the trial judge wrote no opinion. Not having had adequate findings of fact and conclusions of law before us we cannot adjudicate the issues presented by this appeal. The case therefore must be remanded to the trial court to the end that the necessary findings of fact and conclusions of law may be made and the record be augmented by further evidence, if that be necessary.

The judgment will be vacated and the case will be remanded with directions to proceed in accordance with this opinion.[7]

6. The proceeding against Fox is one for civil contempt upon a motion made in the principal action. Rule 52(a) provides that findings of fact and conclusions of law are not necessary on motions except as provided in Rule 41(b) relating to involuntary dismissal.

7. A supplemental record now before this court contains certain depositions, taken in the action against Fox now pending in New York. Statements contained therein shed some light on whether there was a reasonable basis for Fox's apprehension of incrimination in the matter now before us. These depositions, from the proceedings in New York, were not before the court below.

In what we believe is a proper exercise of our discretion we have not included the material in these depositions in our consideration of this case. Bowing to the time honored rule that findings of fact are within the exclusive province of the trial court, this supplemental record will be returned to the court below for inclusion in the record on reconsideration of the issues presented.